David H. Herrington (*pro hac vice pending*)
dherrington@cgsh.com
Arminda B. Bepko (*pro hac vice pending*)
abepko@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone:   (212) 225-2000
Facsimile:    (212) 225-3999

Nowell Bamberger (*pro hac vice pending*)
nbamberger@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue NW
Washington, DC 20037
Telephone:   (202) 974-1500
Facsimile:    (202) 974-1999

Ragesh K. Tangri (SBN 159477)
rtangri@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:   (415) 362-6666
Facsimile:    (415) 236-6300

W. Henry Huttinger (SBN 312843)
hhuttinger@durietangri.com
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
Telephone:   (213) 992-4499
Facsimile:    (415) 236-6300

Attorneys for Plaintiff MEDYTOX INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDYTOX INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>AEON BIOPHARMA, INC. and DAEWOONG PHARMACEUTICAL CO. LTD.<br><br>                    Defendants. | Case No. 8:21-CV-00903<br><br>**COMPLAINT FOR:**<br><br>**1. VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S. CODE § 1836)** |

Plaintiff Medytox Inc. ("Medytox") brings this Complaint against AEON Biopharma, Inc. ("AEON") and Daewoong Pharmaceutical Co., Ltd. ("Daewoong" and together with AEON "Defendants"), for trade secret misappropriation in violation of the Defend Trade Secrets Act (18 U.S.C § 1836).  This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1836(c).  Medytox alleges, on personal knowledge as to itself and on information and belief as to others, as follows:

## I.     INTRODUCTION

1.     Medytox, a manufacturer of botulinum neurotoxin ("BTX") products, is bringing this suit against AEON and Daewoong to address their use of trade secrets misappropriated from Medytox to develop, conduct clinical trials of, seek U.S. Food and Drug Administration ("FDA") approval for, and ultimately market and sell therapeutic BTX products in the United States.  AEON and Daewoong announced in December 2019 that they had entered into a partnership to pursue these activities and, on information and belief, they began engaging in these activities in 2020.

2.     AEON and Daewoong are engaging in these activities despite the fact that it has been adjudicated that Daewoong's BTX products are the fruit of its misappropriation of Medytox's BTX manufacturing process trade secrets.  That determination was made in a proceeding brought in the International Trade Commission ("ITC") by Medytox and its co-complainants Allergan Limited (previously known as Allergan plc) and Allergan Inc., (together, "Allergan").  The full Commission issued its decision on December 16, 2020, affirming a decision issued on July 6, 2020 by Administrative Law Judge David Shaw in which ALJ Shaw likewise determined that Daewoong's BTX products are the fruit of trade secrets misappropriated from Medytox.

3.     While the respondents in the ITC proceeding were Daewoong and its partner for aesthetic BTX products, Evolus, Inc. ("Evolus"), the drug substance — that is, the active ingredient — that Daewoong uses the misappropriated Medytox trade secrets to manufacture is the same for its aesthetic and therapeutic BTX products.  And the ITC made clear that the scope of its investigation and findings encompassed Daewoong's BTX

products generally and was not limited to the products being used for aesthetic applications.

4.     Accordingly, the basis for Medytox's claims in this suit has already been established.  The ITC's finding that Daewoong's BTX products are the fruit of the misappropriation of Medytox trade secrets is entitled to issue preclusive effect as to Daewoong, as a party to the ITC proceeding, and as to AEON, because there is "privity" between Daewoong and AEON for purposes of issue preclusion.

5.     It is well established that, while Daewoong wrongfully procured the Medytox trade secrets and is using them to make BTX products in Korea, the activities that Daewoong and AEON are conducting in the United States to exploit the misappropriated trade secrets and the products that are the fruits of the misappropriation are a form of use that gives rise to liability for misappropriation of the trade secrets.  This suit is addressed to these activities that are directed to and conducted in the United States.

6.     As discussed in more detail below, Medytox brought a suit in 2017 in a California state court to address Daewoong's misappropriation of the Medytox trade secrets and its partnership with Evolus to exploit those trade secrets.  The state court granted a *forum non conveniens* motion by the defendants, based principally on the premise that the relevant documents and witnesses were located in Korea and so it would be burdensome to address the claims in a U.S. lawsuit.  The state court ultimately dismissed the claims against Daewoong and stayed the claims against Evolus and the other non-Korean defendants.

7.     When Evolus subsequently obtained FDA approval to introduce Daewoong's aesthetic BTX products in the U.S., it became appropriate for Medytox (together with its co-complainant, Allergan) to bring an ITC case against Daewoong and Evolus to address the harm that their unfair acts would cause to the legitimate BTX industry in this country. In the ITC case, the parties took discovery of the relevant documents and witnesses and developed a complete evidentiary record and, based on that evidentiary record, the issues have now been adjudicated.  Accordingly, it is proper for the claims here to move

forward, and indeed they are ripe for determination on summary judgment based on issue preclusion.

8. Medytox also is asserting here a conditional claim with respect to the misappropriation of its *C. botulinum* strain. In addition to the finding of misappropriation of Medytox's manufacturing process trade secrets, the ITC also determined, based on DNA testing and other evidence, that it was conclusively established that Daewoong had wrongfully obtained Medytox's valuable *Clostridium botulinum* strain and is using the strain to make its BTX products. The ITC declined to find a violation of 19 U.S.C. § 1337 (Section 337) as to the Medytox strain based on its view that prior transfers of the strain rendered it ineligible for trade secret protection. The ITC's ruling is on appeal to the United States Court of Appeals for the Federal Circuit. Accordingly, Medytox is including in this suit a conditional misappropriation claim in connection with the Medytox strain based on its good faith and nonfrivolous argument for modifying or reversing the conclusion that prior transfers of the Medytox strain rendered it ineligible for trade secret protection.

## II. PARTIES

### A. Medytox

9. Plaintiff Medytox is a limited liability corporation established under the laws of the Republic of Korea ("Korea") with its principal place of business located at 626 Tehran Road, Gangnam, Seoul, Korea. A subsidiary of Medytox maintains offices in the United States at Olympic Plaza, 11500 W. Olympic Blvd., Suite 400, Los Angeles, California 90064. Its shares trade on the KOSDAQ under the code "086900." Medytox is the owner of the trade secrets at issue in this case.

### B. Daewoong

10. Defendant Daewoong is a limited liability corporation organized under the laws of the Republic of Korea, having its principal place of business at Bongeunsaro 114-gil 12, Gangnam, Seoul, Korea.

### C.   AEON

11.   On information and belief, AEON is a Delaware corporation founded in 2012 with its principal place of business located at 4040 MacArthur Boulevard, Suite 310, Newport Beach, California, United States, 92660.

## III.   JURISDICTION AND VENUE

12.   Medytox brings this civil action to address the activities of Daewoong and AEON involving the misappropriation and use of Medytox's trade secrets for products that are used in, or intended for use in, interstate or foreign commerce.  18 U.S.C. § 1836(b)(1).  District courts have original jurisdiction of such civil actions brought under this section.  18 U.S.C. § 1836(c).

13.   Personal jurisdiction over AEON is proper because AEON is based in Newport Beach, California and has engaged in activities that give rise to the claims presented here in California and in the United States more broadly.

14.   Personal jurisdiction over Daewoong is likewise proper because it has engaged in activities that give rise to the claims presented here that are directly targeted to and have an impact in the United States, including in particular California.  As set forth in detail below, Daewoong's activities include transferring to AEON in the United States, including California, materials and information containing the misappropriated Medytox trade secrets, including detailed descriptions of the manufacturing processes that were developed with the trade secrets and the *C. botulinum* strain that Daewoong improperly obtained from Medytox, so that these materials and information can be submitted to the FDA for purposes of gaining approval for Daewoong's therapeutic BTX products. Because Daewoong's partner AEON has its principal place of business in California, at least some portion of Daewoong's collaboration and transfers of materials and information would have necessarily occurred in California.  Further, Daewoong has provided the therapeutic BTX products made using the misappropriated trade secrets to AEON for purposes of conducting clinical trials in the United States to support the FDA application.  Thus, Daewoong has caused the misappropriated trade secrets to be

transferred, exploited, and used in the United States, including in particular California.

15.    Venue is proper in this district because Defendant AEON has its principal place of business in Orange County and because a substantial part of the events giving rise to the claims asserted here with respect to the collaboration of Daewoong and AEON took place in this district.  28 U.S.C. § 1391(b).

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Prior Litigation

16.    Medytox was founded in 2000 for the purpose of researching, developing, and manufacturing BTX products.  The CEO of Medytox, Dr. Hyun Ho Jung, obtained rights in 1999 to a Hall A-hyper strain, the *C. botulinum* strain that Medytox uses to produce its BTX products.  Medytox spent years conducting research and development on both its strain and on a proprietary manufacturing process to create a commercial BTX product using that strain.  These efforts led to the development, regulatory approval, and commercial launch of the first domestically developed BTX product in Korea, referred to as "Meditoxin."  In addition, Medytox has continued to conduct research and to develop innovative BTX-related technology and new BTX products, including a liquid-form BTX product known as MT10109L that it has licensed to Allergan for commercialization in the United States.

17.    For its part, Daewoong had been the distributor in Korea of Allergan's BOTOX® product.  But "[b]y late 2008, when Daewoong realized that its BOTOX® distribution agreement would soon come to an end, it became a priority for Daewoong to find an alternative."  Ex. A (FID at 53).  Ultimately, Daewoong resorted to misappropriating Medytox's manufacturing process trade secrets and *C. botulinum* strain and using them to develop its own BTX products.

18.    Daewoong subsequently entered into an agreement with Evolus that led to Daewoong and Evolus working in partnership to apply for FDA approval for the sale of Daewoong's aesthetic BTX products in the United States.

19.    After learning of facts suggesting Daewoong's misconduct, Medytox brought

a suit in state court in Orange County, California, against Daewoong and Evolus. *Medytox Inc. v. Daewoong Pharm. Co., Ltd.*, Case No. 30-2017-00924912-CU-IP-CJC (Cal. Super. Ct. Orange Cty. 2017) (the "Orange County Suit").  Evolus had been acquired and was owned by a company known as Alphaeon Corporation and its parent, SCH-AEON, LLC; those companies also were named as defendants (collectively, the "Evolus Defendants").

20.     On information and belief, AEON is a descendant of Alphaeon Corporation, but has a different status based on corporate changes that resulted in its assuming its current form in 2019.  In its current form, AEON does not hold any ownership interest in Evolus.  AEON's affiliate, Alphaeon 1 LLC, owns approximately 19.8% of Evolus's stock, as a result of Evolus's initial public offering and various other transactions.  But AEON itself does not hold any Evolus stock.

21.     In the Orange County Suit, Daewoong and the Evolus Defendants moved to stay or dismiss the suit based on *forum non conveniens* based on the argument that the underlying allegations concerning Daewoong's misappropriation of the Medytox trade secrets involved documents and witnesses located in Korea and accordingly the underlying claim should be addressed in Korea.  The court granted that motion and stayed the Orange County Suit.  Minute Order, *Medytox Inc. v. Daewoong Pharm. Co., Ltd.*, Case No. 30-2017-00924912-CU-IP-CJC (Cal. Super. Ct. Orange Cty. Oct. 12, 2017), ECF No. 237.  After Medytox filed suit against Daewoong in Korea, the court granted Daewoong's subsequent motion to dismiss the claims against it without prejudice, while maintaining the stay of the claims against the Evolus Defendants.  Minute Order, *Medytox Inc. v. Daewoong Pharm. Co., Ltd.*, Case No. 30-2017-00924912-CU-IP-CJC (Cal. Super. Ct. Orange Cty. Apr. 27, 2018), ECF No. 321.  In light of the court's rulings, the claims against the Evolus Defendants would not be ripe or permitted to move forward in the Orange County Suit until there was an adjudication of the underlying claims that Daewoong had misappropriated Medytox's trade secrets and used them to develop and make the products at issue.

22.     Subsequently, when Evolus obtained FDA approval for the Daewoong aesthetic BTX products and prepared to commercially launch those products, it became appropriate to address the harm that the unfair acts of Daewoong and Evolus would cause to the legitimate BTX industry in the United States by bringing an action in the ITC under Section 337 of the Tariff Act of 1930 (19 U.S.C. § 1337).  *See In re Certain Botulinum Toxin Products, Processes for Manufacturing or Relating to Same and Certain Products Containing Same*, U.S. ITC Inv. 337-TA-1145 (the "ITC Investigation").  As noted, Medytox's co-complainant in the ITC Investigation was Allergan, which had received a license from Medytox years earlier to introduce Medytox's innovative BTX product, MT10109L, into the U.S. market.

23.     Medytox and Allergan filed their complaint against Daewoong and Evolus in the ITC in January 2019, and on March 6, 2019, the ITC instituted an investigation.  84 Fed. Reg. 8112 (Mar. 6, 2019).  In the course of the ITC proceeding, the parties conducted full discovery of the claims that Daewoong and Evolus had misappropriated and used the Medytox trade secrets, including production of relevant documents and depositions of relevant witnesses.  Both sides also engaged expert witnesses to support their claims and defenses, who prepared expert reports and were deposed.

24.     After nearly a year of discovery on an expedited schedule, the ITC case culminated in a four-day evidentiary hearing before Administrative Law Judge ("ALJ") David Shaw from February 4 to 7, 2020.  Following that hearing, the parties (including the Office of Unfair Import Investigations) submitted over a thousand pages of post-hearing briefing.  Thus, the evidentiary record needed to assess the claims of misappropriation of the Medytox trade secrets has been fully developed.

25.     Based on that evidentiary record, ALJ Shaw issued a 274-page ruling finding that Daewoong and Evolus had in fact misappropriated and used the Medytox manufacturing trade secrets and Medytox's *C. botulinum* strain.  Final Initial Determination ("FID") at 94-110, 132-52.  The public version of ALJ Shaw's decision is attached hereto as Exhibit A.  The full Commission of the ITC (referred to as the

"Commission") reviewed portions of ALJ Shaw's ruling and affirmed in full his determination that Daewoong and Evolus had misappropriated and used the Medytox manufacturing process trade secrets. Comm'n Op. at 34–44. The public version of the Commission's decision is attached hereto as Exhibit B.

26.   The Commission also agreed with ALJ Shaw in determining that the DNA testing and other evidence "establishes by more than a preponderance of the evidence (indeed by near certainty) that Daewoong derived its strain from Medytox." Ex. B (Comm'n Op. at 37). The Commission also observed that the evidence established other elements needed to establish a trade secret misappropriation claim based on Daewoong's wrongful taking of the Medytox strain, but it ultimately concluded that the strain was not eligible for trade secret protection based on its view of the impact of earlier transfers of the strain before Medytox acquired it. *Id.* at 25–34.

27.   Both sides filed appeals with U.S. Court of Appeals for the Federal Circuit of aspects of the ITC's ruling. Medytox and Allergan appealed the Commission's determination of non-violation of Section 337 as to Medytox's *C. botulinum* strain, and Daewoong and Evolus appealed the determination of the violation of Section 337 based on misappropriation of the Medytox manufacturing process trade secrets. Pet. for Review, *Allergan Ltd v. Int'l Trade Comm'n*, No. 21-1653 (Fed. Cir. Feb. 12, 2021) ECF No. 1; Pet. for Review, *Daewoong Pharm. Co., Ltd. v. Int'l Trade Comm'n*, No. 21-1654 (Fed. Cir. Feb. 15, 2021), ECF No. 1-2; Corrected Order, *Allergan Ltd v. Int'l Trade Comm'n*, Nos. 21-1653, 21-1654 (Fed. Cir. Feb. 16, 2021), ECF No. 24.

28.   On February 18, 2021, shortly after the filing of appeals, Allergan and Medytox reached a settlement with Evolus that grants Evolus a license to import and sell one of the accused products, Jeuveau. Pursuant to the settlement, on March 3, 2021, Allergan, Medytox, and Evolus filed a joint petition in the ITC to rescind the remedial orders based on the finding of misappropriation of the Medytox manufacturing process trade secrets. Daewoong and the Commission (which participates in appeals of its rulings) have indicated that they will take the position that the rescission of the remedial

orders with respect to the misappropriation of the Medytox manufacturing process has rendered the appeals of the Commission's decision moot.

29.     Neither Daewoong nor AEON is a party to the Settlement Agreement, and thus "neither is a party to the mutual releases of liability, covenants not to sue, or licenses granted to Evolus."  *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same and Certain Prods. Containing Same*, Inv. No. 337-TA-1145, USITC Pub. 735885, Joint Pet. of Complainants Medytox and Allergan and Resp't Evolus to Rescind the Limited Exclusion Order and the Cease and Desist Order, Exhibit B at 8.1, 11.1 (Mar. 3, 2021) (the "Settlement Agreement").  To the contrary, the Settlement Agreement expressly provides that "[n]othing in this Agreement creates any right enforceable by Daewoong."  *Id.* ¶ 11.1 (Mar. 3, 2021).

30.     While the settlement with Evolus resolves Medytox's claims against Evolus and its sale in the U.S. of aesthetic BTX products, it does not resolve Medytox's claims with respect to Daewoong's therapeutic BTX products in the United States.  AEON is Daewoong's partner for therapeutic BTX products in the United States.[1]  In December 2019, AEON and Daewoong announced that they had formed a partnership to commercialize therapeutic BTX products in the United States.[2]  AEON's therapeutic BTX products are distinct from Evolus's aesthetic BTX products as a commercial and regulatory matter, as reflected by the fact that they are the subject of different partnerships with Daewoong and different activities relating to their commercialization in the U.S., including different regulatory approval processes with the FDA.

31.     At the same time, the underlying facts that support and establish the claims

---

[1] AEON and Evolus are distinct entities; and as a result of transactions in 2019, AEON no longer holds any ownership interest in Evolus.  Evolus, Inc., Annual Report at 14, 37, 40 (Form 10-K) (Mar. 25, 2021).

[2] Lee Han-soo, *Daewoong partners with AEON Biopharma to tap therapeutic BTX market*, Korea Biomedical Review (Dec. 23, 2019), https://www.koreabiomed.com/news/articleView.html?idxno=7058.

against AEON based on its collaboration with Daewoong have been established in the ITC case against Daewoong.  As noted, the neurotoxin drug substance — i.e., the active ingredient — is what is made by Daewoong using the manufacturing trade secrets and the BTX strain that Daewoong misappropriated from Medytox.  This neurotoxin drug substance is the active ingredient in both the aesthetic BTX products that are the subject of the Daewoong-Evolus partnership and the therapeutic BTX products that are the subject of the Daewoong-AEON partnership.

32.     Despite these facts, Daewoong and AEON attempted to challenge the inclusion of AEON's therapeutic BTX products in the ITC determination of a Section 337 violation based on trade secret misappropriation and the remedial orders that the ITC issued based on that determination.  AEON conceded that its BTX product, referred to as "ABP-450," uses "the same neurotoxin that is approved and marketed for an aesthetic indication by Evolus under the brand name Jeuveau" — that, is the same drug substance that the ITC had found to be made with the misappropriated Medytox trade secrets.[3]  Yet AEON contended that its Daewoong-made therapeutic BTX products were outside the scope of the ITC case and that, if they were within the scope of the case, they should be carved out from the ITC's exclusion orders based on public interest considerations.  *Id.*

33.     The Commission rejected both of AEON's arguments.  Rejecting AEON's argument that its products were not subject to the ITC's findings, the Commission stated that "both aesthetic and therapeutic versions of BOTOX® have been considered in the

---

[3] *Certain Botulinum Toxin Prods., Processes for Mfg. Or Relating to Same And Certain Prods. Containing Same*, Inv. No. 337-TA-1145, USITC Pub. 721669, AEON Biopharma, Inc.'s Public Interest Statement at 1 (Oct. 9, 2020); *see also* AEON Biopharma Doses First Patient in Phase 2 Trial of ABP-450 for the Treatment of Cervical Dystonia, *Yahoo* (Apr. 5, 2021), https://finance.yahoo.com/news/aeon-biopharma-doses-first-patient-120000458.html; AEON Biopharma Announces FDA Acceptance of IND for ABP-450 as a Treatment for Cervical Dystonia; Secures $25 Million Investment, *Globe Newswire* (Sept. 02, 2020), https://www.globenewswire.com/news-release/2020/09/02 /2088016/0/en/AEON-Biopharma-Announces-FDA-Acceptance-of-IND-for-ABP-450-as-a-Treatment-for-Cervical-Dystonia-Secures-25-Million-Investment.html.

domestic industry analysis and while Respondents' products may be currently sold for aesthetic applications only, the scope of the investigation (botulinum neurotoxin products) is not so limited." Ex. B (Comm'n Op. at 62). The Commission also rejected AEON's request for a carve-out of AEON's products from the exclusion orders. Thus, as Daewoong itself has admitted in a recent submission to the Commission, the Commission "evidently agreed" that "AEON 'uses the exact same trade secrets . . . found to have been misappropriated' by the ALJ and AEON's therapeutic product uses an identical active ingredient to the one found in Jeuveau®." *Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same and Certain Prods. Containing Same*, Inv. No. 337-TA-1145, USITC Pub. 738910, Resp't Daewoong Pharm. Co., Ltd.'s (1) Response to Complainants Medytox and Allergan's and Resp't Evolus's Joint Pet. to Rescind the Remedial Orders; and (2) Mot. to Vacate the Comm'n's Op. at 4 n.1 (Apr. 5, 2021) ("Daewoong's Mot. to Vacate").

34.     In addition to the fact that the BTX products made by Daewoong for AEON were directly at issue in the ITC case, the circumstances here establish "privity" between AEON and Daewoong so as to support giving the ITC decision issue preclusive effect as to AEON. Daewoong represented the identical interest that AEON has in relation to Medytox's claim of trade secret misappropriation: that is, to vigorously defend against that claim. And Daewoong had a full and fair opportunity to defend against the claim, as it was able to obtain full discovery relating to the claim and to present its defenses and arguments in the evidentiary hearing and in the extensive post-hearing briefing to ALJ Shaw and the Commission.

35.     Further, Daewoong and AEON are actively partnering to apply for and obtain FDA approval for the sale of ABP-450 in the United States, which involves transferring the trade secrets misappropriated from Medytox to the United States, along with products that are the fruits of that misappropriation, and exploiting the trade secrets here. It is well established that even where the acts of improperly acquiring and implementing trade secrets take place outside of the United States, the act of exploiting the trade secrets in this

country, including by marketing products that have been made with the trade secrets, is a form of use that gives rise to misappropriation liability here. Thus, just as Evolus was found to have joined with Daewoong in using the misappropriated trade secrets in the United States, the same is true of AEON.

36. Because the actions of Daewoong and AEON to exploit the misappropriated Medytox trade secrets in the United States — including by developing, conducting clinical trials of, seeking FDA approval for, and planning to market and sell therapeutic BTX products in this country — implicate federal interests and are nationwide in scope, it is appropriate to address them under the federal Defend Trade Secrets Act (18 U.S.C § 1836).

37. Further, in light of the proceedings and determinations that have occurred in the ITC case, the decision in the Orange County Suit to dismiss and/or stay the claims presented in that suit based on *forum non conveniens*, premised on the circumstances at that time, should not serve as an obstacle to the claims presented here. As noted, the primary reason for the Orange County court's determination was that the documents and witnesses needed to address the underlying claims of misappropriation were located in Korea and accordingly, it would be difficult to collect and present the relevant evidence in a U.S. court. But because it subsequently became appropriate to bring an ITC case against Daewoong and Evolus based on the importation of Evolus's products in the U.S., the parties were able to conduct full discovery of the relevant documents and witnesses. That evidence was then presented to the ITC, and the issues have been adjudicated.

38. Thus, while it may have been the expectation at the time of the Orange County court's *forum non conveniens* ruling that the evidence-gathering and issue-determination would take place in the Korean suit that Medytox subsequently filed against Daewoong (which is still pending and has not yet produced any determinations), the issues have in fact been investigated and adjudicated in the ITC. Further, given that the claims presented in this suit are based on U.S. law and addressed to the actions of Daewoong and AEON that are directed to and conducted in the U.S., it is appropriate to

apply and adhere to the adjudication of the claims by the ITC, as a U.S. tribunal applying U.S. law.

39.     The facts establishing AEON's and Daewoong's liability are set forth in greater detail below.  As reflected in the citations to the Commission Opinion and the ALJ's FID, which the Commission Opinion affirmed in relevant part, the allegations set forth below have been adjudicated by the ITC and therefore are established for purposes of this suit as a matter of issue preclusion.  Further, even if the ITC's findings were not entitled to preclusive effect, the evidence that led to the ITC's findings would lead to the same findings here.

### B.     The Technology and Products at Issue

40.     BTX products are made from *C. botulinum*, a bacteria that produces a highly potent neurotoxin that can cause muscle paralysis and death and is responsible for causing botulism. Ex. B (Comm'n Op. at 5–6).  BTX products have both therapeutic applications, including the treatment of chronic migraine headaches, cervical dystonia, hyperhidrosis, spasticity, and urinary incontinence, and aesthetic applications, including the temporary improvement to the appearance of glabellar lines (sometimes called frown lines), lateral canthal lines (sometimes called crow's feet), and forehead lines.  *Id.* at 5.   In its aesthetic and therapeutic applications, a BTX product operates as a neuromuscular blocking agent, which functions by temporarily interfering with nerve signals and temporarily relaxing targeted muscles through localized injections.  *Id.*

41.     The manufacture of BTX products requires use of a commercially viable *C. botulinum* strain.  *Id.* at 6.  Different strains of *C. botulinum* produce different serotypes of neurotoxin.  *Id.*  The serotypes have been labeled alphabetically from serotype A to serotype G, and there are subtypes within each serotype (e.g., A1, A2, etc.).  *Id.*  Type A1 BTX products are the most commercially viable.  *Id.* at 25.  However, not every Type A1-producing strain can be used to make a commercial product; the properties of the strain are exceptionally important when considering whether it can be used for a commercial product.  *Id.*

42.    In addition to requiring a strain, producing a BTX product requires a carefully calibrated manufacturing process.  *Id.* at 6.  The manufacturing process for BTX products includes the manufacturing of the drug substance (also called the "Active Pharmaceutical Ingredient" or "API") and the drug product (the finished dosage form sold to consumers).  Manufacture of the BTX drug substance involves culturing the *C. botulinum* bacteria, and then separating, isolating, and purifying the neurotoxin complex. *Id.*  When cultured (i.e., grown), the *C. botulinum* bacteria secrete the neurotoxin protein molecule along with several other neurotoxin associated proteins.  *Id.*  These collectively, together with the neurotoxin protein molecule, form the whole protein complex, which is called the neurotoxin complex.  *Id.*

43.    The molecular weight of this whole neurotoxin complex can vary, but the largest size is 900 kDa.  *Id.*  The BTX products of Medytox, Daewoong, Evolus, and AEON all use the neurotoxin complex, with a molecular weight of 900kDa.  *Id.*

44.    After the drug substance is obtained, it must be formulated and packaged into the final drug product (i.e., a form that can be used by and sold to clinicians).  Production of the drug product involves combining the drug substance with additional ingredients known as excipients, which are used to stabilize the neurotoxin molecules and provide a sterile preparation of the product for injection. Ex. A (FID at 10).

45.    BTX products can be sold in either a solid or liquid form using a variety of excipients.  The solid forms can be a powder that is either freeze-dried (or "lyophilized") or vacuum-dried, which must be diluted with a suitable liquid prior to injection.  The liquid forms do not require this step and can be injected directly.  *Id.* at 11.

46.    The particular *C. botulinum* strain that Medytox uses to make its BTX products, which the ITC found to have been wrongfully taken and used by Daewoong for making its BTX products, derives from a famous strain known as the "Hall A-hyper" strain.  Ex. B (Comm'n Op. at 7).  The Hall A-hyper was isolated in the early twentieth century and was later developed by U.S. Army researchers in the 1940s and has been prized ever since for its characteristics that cannot be found in other *C. botulinum* strains.

*Id.* at 3, 6.  Researchers at the U.S. Army Medical Research Institute of Infectious Diseases ("USAMRIID") developed the Hall A-hyper strain by screening colonies of the bacteria for high toxin producers over several iterations.  Ex. A (FID at 11).  As an exceptionally productive strain, the Hall A-hyper strain makes the separation and purification process easier and the manufacturing process safer.  *Id.* at 12.  The Hall A-hyper strain is also stable, which means it does not degenerate over time to a strain that produces less neurotoxin.  *Id.* at 33.  Finally, it only sporulates poorly and does not form spores during the manufacturing process, which streamlines downstream processing and helps manufacturers meet the high standards required for making botulinum toxin.  *Id.* at 6.

47.     Medytox owns and uses a strain of *C. botulinum* that traces back to the Hall A-hyper strain.  *Id.* at 27.  Medytox's *C. botulinum* strain is used to produce the botulinum type A drug substance that is formulated into pharmaceutical products that are commercialized as, inter alia, Meditoxin and Innotox.  The botulinum type A drug substance from the Medytox strain is also used in the formulation for MT10109L, a liquid BTX product that Medytox licensed to Allergan for commercialization in the United States.

### C.    Medytox's Development of its Trade Secret Manufacturing Process

48.     Medytox was founded in 2000, and spent years conducting extensive research and development of a manufacturing process that would transform the deadly toxin produced by its *C. botulinum* strain into a product safe for human use.  Ex. A (FID at 6, 123–26).  This required a substantial investment by Medytox, including millions of dollars spent on research and development.  *Id.*  These efforts resulted in an optimized manufacturing process for producing the Drug Substance used in Medytox's first commercial BTX product, Meditoxin.  *Id.*  The development of this manufacturing process took Medytox more than four years from the initial research and development phase to the grant of regulatory approval.  *Id.* at 127.

49.     At a high-level, the Drug Substance manufacturing process for a BTX

product can be divided into four phases: (1) culturing the strain, which involves creating a "medium" containing essential nutrients that allows the *C. botulinum* strain to replicate so that there is enough of it for use in research and/or commercial production; (2) separating the neurotoxin released into the culturing medium from the undesirable substances involved in this process, including other proteins and any remaining bacteria; (3) purifying the neurotoxin, which involves multiple additional processes to remove finer pollutants from the Drug Substance so that what is left is a pure Drug Substance, and (4) dispensing the purified toxin into the appropriate storage containers.  *Id.* at 9–11.  Once the Drug Substance is created, a separate manufacturing process is used to incorporate this Drug Substance into a final Drug Product that can be administered for aesthetic or therapeutic purposes.  *Id.* at 9.

50.    When Medytox first began its research and development efforts for its Drug Substance manufacturing process, existing academic literature described only how type A botulinum toxin Drug Substance could be produced for research purposes, and even then only in general terms — no process described in literature was independently sufficient to produce a commercially viable BTX product capable of obtaining regulatory approval. *Id.* at 118–19.

51.    When Medytox was founded, Allergan and Ipsen were the only two companies in the world to have successfully manufactured a BTX product from a BTX Strain and their manufacturing processes were not publicly known.  Companies such as Medytox that have developed BTX manufacturing processes that have gained regulatory approval and commercial success zealously guard the secrecy of their manufacturing processes.  *Id.* at 117.  As a result, no publicly available literature provides the technical know-how and processes required to successfully commercialize a BTX product.  *Id.* at 118–19.

52.    Developing the manufacturing process for the Meditoxin Drug Substance required meticulous, time-consuming, and expensive research and development efforts by Medytox.  Particularly extensive efforts were devoted to the separation and purification

process, which involves separating the cultured neurotoxin complex from the undesirable substances contained in the culture medium and using a variety of chemical compounds and techniques to remove finer pollutants from the Drug Substance. *Id.* at 123–26. The precise steps in the separation and purification processes must be designed by highly skilled researchers who are familiar with the various fermentation, precipitation, and filtration techniques that are used to accomplish separation and purification. Those precise steps must then be run over and over again to generate test results and ascertain whether the steps must be altered or rearranged. *Id.* And every time a step is altered or rearranged, the entire process must again be run numerous times to verify that the resultant product was indeed improved by the change. *Id.*

53.     On a more granular level, researchers must test the precise process parameters (such as time, temperature, and pH levels) that are used at each discrete step in the process to determine whether changes in those inputs have a positive or negative effect on the ultimate Drug Substance produced. And again, for each change made to a process parameter, the entire process must be run numerous times to verify that a change in a parameter in one step did not produce unintended negative consequences in later steps.

54.     After each run of the manufacturing process, the resultant Drug Substance also had to be tested to verify that it had met the high standards that a biologic product must meet for regulatory approval. *Id.* at 125. The Drug Substance produced not only had to reach the required potency for commercialization, but also be sufficiently purified to meet safety standards. *Id.* This quality testing added another layer of difficulty into the research and development process.

55.     Medytox conducted extensive research and development along these lines over the course of more than four years in order to arrive at an optimized manufacturing process for the Meditoxin Drug Substance and obtain regulatory approval for Meditoxin in Korea. *Id.* at 123–26. As a result, Medytox was able to obtain regulatory approval for Meditoxin in Korea in March 2006. It has gone on to leverage its research and

development work to create the manufacturing processes for other innovative BTX products.  *Id.* at 126.  These BTX products provide significant value to Medytox and have enabled it to achieve substantial growth over the past two decades.

### D. The Misappropriation and Use of Medytox's Trade Secrets by Daewoong, Evolus and AEON

56.   Daewoong was formerly a distributor of Allergan's BOTOX® product in Korea.  Ex. A (FID at 50).  In late 2008, finding an alternative to BOTOX® became a priority for Daewoong.  *Id.* at 53.  Ultimately, Daewoong resorted to misappropriating Medytox's manufacturing process and strain in order to develop its BTX product.  *In re Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same and Certain Prods. Containing Same*, U.S. ITC Inv. 337-TA-1145 Complaint, USITC Pub. 1397113 at ¶¶ 106–12 (Jan. 31, 2019).

57.   Daewoong uses the project name "DWP-450" to refer to its BTX products.  Upon procuring a *C. botulinum* strain (which the ITC ultimately found to have been wrongfully obtained from Medytox), Daewoong registered the strain with the Korean government and it was assigned the control number 4-029-CBB-IS-001.  DWP-450-derived products are sold in South Korea under the brand name Nabota.

58.   Daewoong first partnered with Evolus to bring a derivation of DWP-450 to market in the U.S. under the brand name Jeuveau.  Jeuveau is a 900kDa product that is FDA-approved for aesthetic indications; specifically, to treat glabellar lines.  DWP-450, and derivations of DWP-450 were found by the ITC to be made using the manufacturing process trade secrets and *C. botulinum* strain that Daewoong had wrongfully obtained from Medytox.

59.   Through its agreement with Daewoong, AEON has a license and "exclusive development and distribution rights" to introduce its ABP-450 BTX product to the U.S.

market.[4]  As noted, AEON has conceded that the ABP-450 product uses the same drug substance active ingredient that the ITC found to be made by Daewoong using the manufacturing process trade secrets that Daewoong misappropriated from Medytox and the *C. botulinum* strain that Daewoong wrongfully obtained from Medytox.

60.     On September 2, 2020, AEON announced that the FDA had accepted its Investigational New Drug Application ("IND") for ABP-450 to treat cervical dystonia. The preparation and submission of the IND for ABP-450 necessarily entailed the active collaboration between AEON and Daewoong to obtain and exploit in the United States, including California, materials and information embodying and reflecting the manufacturing process trade secrets that Daewoong misappropriated from Medytox and the *C. botulinum* strain that Daewoong wrongfully obtained from Medytox.

61.     An IND is a detailed request for authorization to administer a drug or biologic to humans for testing the product's safety and efficacy.[5]  Prior to marketing a pharmaceutical product, a New Drug Application ("NDA") or Biologics License Application ("BLA") must be submitted and approved by the FDA.  In order to submit an NDA or BLA, products must first be tested for safety and efficacy in human clinical trials. Before engaging in such testing, a company such as AEON must first submit and gain FDA approval for an IND, which allows the drug or biologic to be legally transported and distributed across state lines for use in the clinical trials that will support the NDA and BLA.

62.     An IND requires the submission of detailed information on the drug or

---

[4] AEON Biopharma Announces FDA Acceptance of IND for ABP-450 as a Treatment for Cervical Dystonia; Secures $25 Million Investment, *Globe Newswire* (Sept. 02, 2020), https://www.globenewswire.com/news-release/2020/09/02/2088016/0/en/AEON-Biopharma-Announces-FDA-Acceptance-of-IND-for-ABP-450-as-a-Treatment-for-Cervical-Dystonia-Secures-25-Million-Investment.html.

[5] Common Problems to Avoid with IND Applications for New Drugs and Biologics, *Criterion Edge*, https://criterionedge.com/common-problems-to-avoid-with-ind-applications-for-new-drugs-and-biologics/ (last visited May 14, 2021).

biologic that falls into three broad categories: (a) Animal Pharmacology and Toxicology Studies; (b) Manufacturing Information; and (c) Clinical Protocol and Investigator.  The manufacturing process is a crucial part of the manufacturing information required in an IND: specifically, the manufacturer must provide "[i]nformation pertaining to the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product.  This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug."[6]

63.    Once an IND is submitted, the FDA has 30 days to comment.[7]  Following the FDA's review process, it will either approve the IND, which indicates that the product is safe to proceed as an investigational drug or biologic for use in clinical trials, or it will subject the product to a clinical hold, which will delay or suspend clinical investigation.

64.    Thus, AEON and Daewoong have collaborated to use and exploit the manufacturing process trade secrets misappropriated from Medytox in the United States, including in California, in connection with the application for the IND for ABP-450. Following the FDA's approval of the IND on September 2, 2020, AEON and Daewoong collaborated in importing significant quantities of ABP-450 into the United States for the purpose of conducting clinical trials.  AEON's public announcements confirm that this has occurred.  On information and belief, AEON has been conducting clinical trials using the ABP-450 products provided by Daewoong since shortly after receiving the FDA's approval of the IND for ABP-450 on September 2, 2020.

65.    On March 8, 2021, AEON announced the initiation of enrollment in a Phase 2 study of ABP-450 for the preventive treatment of migraine headaches.  On April 5, 2021, AEON announced the initiation of patient dosing in a Phase 2 study of ABP-450 for

---

[6] Investigational New Drug (IND) Application, *FDA* (Feb. 24, 2021), https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[7] Common Problems to Avoid with IND Applications for New Drugs and Biologics, *Criterion Edge*, https://criterionedge.com/common-problems-to-avoid-with-ind-applications-for-new-drugs-and-biologics/ (last visited May 14, 2021).

the treatment of cervical dystonia.

66.     In sum, AEON and Daewoong have been collaborating to actively use and exploit the Medytox trade secrets in the U.S., and they evidently plan to continue doing so in seeking FDA approval for their therapeutic BTX products and then commercially launching those products.

**E.     The ITC Investigation**

67.     As outlined above, in January 2019, Medytox and Allergan filed a complaint with the ITC seeking to prevent the importation of DWP-450 into the United States by Daewoong and Evolus on the basis that this product is made using a *C. botulinum* strain and manufacturing process trade secrets that were misappropriated from Medytox.

68.     On March 6, 2019, the ITC instituted an investigation, pursuant to Section 337 of the Tariff Act of 1930 (19 U.S.C. § 1337), to determine whether to ban importation of Daewoong and Evolus's BTX products based on misappropriation of trade secrets that threatened to destroy or substantially injure a domestic industry in the United States.  84 Fed. Reg. 8112 (Mar. 6, 2019).

69.     After nearly a year of discovery, an evidentiary hearing was conducted from February 4 to 7, 2020, after which the parties (including the Office of Unfair Import Investigations) submitted over a thousand pages of post-hearing briefing.

**1.     The ITC's Determination That Daewoong and Evolus Misappropriated Medytox's Manufacturing Process Trade Secrets**

70.     On July 6, 2020, ALJ David Shaw issued a Final Initial Determination finding a violation of Section 337 based on the misappropriation of Medytox's trade secrets by Daewoong and Evolus.  *See* Ex. A (FID at 273).

71.     In doing so, ALJ Shaw determined that the evidence demonstrated Medytox's extensive research and development efforts (as described above), and concluded that Medytox's manufacturing processes constituted protectable trade secrets. Ex. B (Comm'n Op. at 44).  These findings establish Medytox's independent development of its manufacturing process trade secrets.  Medytox's manufacturing processes were

created "following years of extensive experimentation on the optimal method for manufacturing a commercial BTX product." Ex. A (FID at 121–22). These manufacturing processes "have significant commercial value, reflecting years of Medytox R&D" and "are not publicly available and have never been publicly disclosed." *Id.* at 117. This research and development required "substantial investment and effort," *id.* at 123, costing Medytox millions of dollars and requiring significant investments in human capital.

72. In addition, ALJ Shaw determined that Medytox "has always closely guarded its proprietary, confidential manufacturing process information," *id.* at 120, and therefore adequately protected its processes as trade secrets.

73. Based on the evidence adduced in the proceeding, ALJ Shaw determined that the "Medytox [manufacturing] process is protectable as a trade secret, because: (a) it is of economic value, (b) it is not generally known or readily ascertainable, and (c) Medytox has taken reasonable precautions to maintain its secrecy." *Id.* at 127.

74. Further, the findings of the FID establish the misappropriation and use of Medytox's trade secret manufacturing processes. This misappropriation is established by the extensive overlap between Daewoong's and Medytox's manufacturing processes, Daewoong's lack of contemporaneous documentation to corroborate independent development of its manufacturing process, and the implausibly short development period for the Daewoong manufacturing process. Indeed, ALJ Shaw determined that Daewoong had used Medytox's trade secrets from the beginning of its project, observing that "Daewoong's first run of a manufacturing process in August 2010 copies the Meditoxin process." *Id.* at 134. Taken together, these facts establish "that Daewoong wrongfully took the trade secrets by unfair means." *Id.* at 152.

75. Daewoong and Evolus sought review of these findings by the full Commission. Upon review, on December 16, 2020, the Commission affirmed ALJ Shaw's findings that Medytox's manufacturing processes constitute trade secrets and that they were misappropriated by Daewoong and Evolus. *See* Ex. B (Comm'n Op. at 44). In

particular, the ITC confirmed that the misappropriation of the Medytox trade secrets is established by three distinct strands of evidence that mutually support each other:  "(1) the similarity of Daewoong's process to Medytox's; (2) the lack of evidence of Daewoong's independent development; and (3) the implausibly fast timeline by which Daewoong achieved BTX production at commercial scale."  *Id.* at 41.

76.    As Medytox showed, there were key similarities between the Daewoong and Medytox manufacturing processes that cannot be explained by reliance on the available scientific literature.  *See* Ex. A (FID at 132–40) ("Daewoong's manufacturing process substantially overlaps with Medytox's manufacturing process . . . [t]he similarities between the Daewoong and Medytox processes cannot be coincidence."); Ex. B (Comm'n Op. at 44); *see also* Ex. A (FID at 127) ("The evidence thus shows that no single reference cited by respondents discloses each of the specific elements of the Medytox manufacturing processes, or the specific elements in the specific stages of Medytox's manufacturing process.").

77.    Second, Daewoong failed to rebut the evidence of misappropriation by producing contemporaneous documents to corroborate their independent development. Ex. A (FID at 143).  Daewoong had "[o]nly a handful of lab notebooks [that had] been produced in the course of this investigation that pertain[ed] to the development work for DWP-450," a "lack of contemporaneous research and development records" that was "highly unusual for a pharmaceutical company, especially when the drug is successfully brought to market."  *Id.* at 141.  This contrasted with Medytox's production of "voluminous documents demonstrating its R&D" and that "clearly support Medytox's use of academic literature to develop its manufacturing processes."  *Id.* at 147.

78.    Third, the development period for the Daewoong manufacturing process was far too short to support independent development, especially given the inexperienced research and development team to which Daewoong attributed this independent development.  *Id.* at 148; *see also id.* at 151–52 ("From a practical standpoint, such a schedule could not be achieved through independent development from scratch. This is

particularly the case in view of team's lack of BTX experience, the purported development work was done by an intern, and the minimal amount of actual development activity recorded in that time span.").

79.     Based on these three key findings, the ITC determined that Daewoong had not independently developed its own manufacturing process but instead had developed the manufacturing process through its misappropriation and use of trade secrets belonging to Medytox.  *Id.* at 152; Ex B (Comm'n Op. at 44).

### 2.     The Commission's Determination That Daewoong Wrongfully Obtained and Used Medytox's *C. botulinum* Strain

80.     The Commission also affirmed the ALJ's findings that Daewoong had improperly obtained Medytox's *C. botulinum* strain and used it to make its BTX products. Specifically, the Commission concluded that the "genetic evidence establishes by more than a preponderance of the evidence (indeed by near certainty) that Daewoong derived its strain from Medytox."  *Id.* at 37.

81.     The Commission also observed that the evidence established other elements needed to establish a trade secret misappropriation claim based on Daewoong's wrongful taking of the Medytox strain, but it ultimately concluded that the strain was not eligible for trade secret protection based on its view of the impact of earlier transfers of the strain before Medytox acquired it.  *Id.* at 25–34.

82.     The ITC's ruling is on appeal to the United States Court of Appeals for the Federal Circuit.  Accordingly, Medytox is including in this suit a conditional misappropriation claim in connection with the Medytox strain based on its good faith and nonfrivolous argument for modifying or reversing the conclusion that prior transfers of the Medytox strain rendered it ineligible for trade secret misappropriation.

### F.     Daewoong and AEON's Use of the Misappropriated Medytox Manufacturing Processes and *C. botulinum* Strain in the United States

#### 1.     AEON's BTX Product Is Made Using the Medytox *C. botulinum* Strain and Manufacturing Process Trade Secrets

83.     In December 2019, Daewoong and AEON announced a partnership for the commercialization of Daewoong's BTX products for therapeutic applications in the U.S., as well as in Europe, Australia, Canada, Russia, and South Africa.

84.     In its September 2, 2020, announcement that the FDA had accepted its IND for ABP-450 as a treatment for cervical dystonia, AEON admitted that in addition to being a 900 kDal botulinum toxin type-A complex, "ABP-450 is the same botulinum toxin complex that has been approved in the United States, the European Union and Canada for an aesthetic indication."[8]  Thus, AEON confirmed that its ABP-450 BTX product made by Daewoong is the same as the DWP-450 BTX product that Daewoong makes for Evolus and that was found in the ITC to be made with the misappropriated Medytox manufacturing process trade secrets and Medytox *C. botulinum* strain.

85.     In submissions to the ITC, AEON has admitted that there is no suitable alternative to using Medytox's strain and manufacturing processes because "[n]eurotoxins are not interchangeable… [and] AEON has no data to support the possibility of replacing ABP-450 with an alternative neurotoxin, even assuming an alternative neurotoxin would be commercially available.  And, if commercially available, the development of such data to support substitution could not be completed in a commercially reasonable time or for a

---

[8] AEON Biopharma Doses First Patient in Phase 2 Trial of ABP-450 for the Treatment of Cervical Dystonia, *Yahoo* (Apr. 5, 2021), https://finance.yahoo.com/news/aeon-biopharma-doses-first-patient-120000458.html (last visited May 14, 2021) (emphasis added); *see also* AEON Biopharma Announces FDA Acceptance of IND for ABP-450 as a Treatment for Cervical Dystonia; Secures $25 Million Investment, *Globe Newswire* (Sept. 02, 2020), https://www.globenewswire.com/news-release/2020/09/02/2088016/0/en/AEON-Biopharma-Announces-FDA-Acceptance-of-IND-for-ABP-450-as-a-Treatment-for-Cervical-Dystonia-Secures-25-Million-Investment.html.

commercially reasonable cost." *Certain Botulinum Toxin Prods., Processes for Mfg. Or Relating to Same And Certain Prods. Containing Same*, Inv. No. 337-TA-1145, USITC Pub. 721669, AEON Biopharma, Inc.'s Public Interest Statement at 4–5 (Oct. 9, 2020).

86.     Daewoong has confirmed the same facts.  Daewoong has admitted that the Commission agreed with Complainants that "'there is no basis to exempt future products used for therapeutic applications' by AEON because AEON 'uses the exact same trade secrets . . . found to have been misappropriated.'"  Daewoong's Mot. To Vacate at 4 n. 1. Thus, Daewoong acknowledges that the Commission's exclusion order "barred Daewoong from importing 'botulinum toxin products' made using the alleged manufacturing trade secrets, with no distinction made between cosmetic and therapeutic uses of the products." *Id.* at 4; *see also id.* at 6 ("The Commission's orders in this matter have excluded Daewoong's and AEON's products—whether produced for cosmetic or therapeutic uses—from the United States for 21 months.").

**2.     Daewoong and AEON's Use of Medytox's Manufacturing Process Trade Secrets and *C. botulinum* Strain in the United States**

87.     As set forth above, Daewoong and AEON have made extensive use of the manufacturing process trade secrets and *C. botulinum* strain misappropriated from Medytox, in collaborating to develop, conduct clinical trials of, seek FDA approval for, and ultimately market and sell therapeutic BTX products in the United States.

88.     Their exploitation and use of the misappropriated trade secrets is demonstrated by the extensive activities in which they have engaged in order to seek FDA approval for the therapeutic BTX product, ABP-450.  On September 2, 2020, AEON announced that the FDA had accepted its IND application for ABP-450 to treat cervical dystonia.  As noted, an IND requires the submission of detailed materials regarding the drug seeking approval, including detailed information regarding the manufacturing process for the drug product.  Preparing and submitting its IND necessarily entailed obtaining and exploiting the manufacturing process trade secrets misappropriated from Medytox as well as information about the *C. botulinum* strain misappropriated from

Medytox.

89.     Daewoong and AEON are also using the fruits of the misappropriated Medytox manufacturing process trade secrets and *C. botulinum* strain in furtherance of the clinical trials of ABP-450.  On March 8, 2021, AEON announced the initiation of enrollment in a Phase 2 study of ABP-450 for the preventive treatment of migraine.  On April 5, 2021, AEON announced the initiation of patient dosing in a Phase 2 study of ABP-450 for the treatment of cervical dystonia.

### 3.     AEON's Knowledge of Misappropriation

90.     AEON has been aware of the issue of Daewoong's misappropriation of Medytox's trade secrets from the beginning of its collaboration with Daewoong.  By the time AEON announced its partnership with Daewoong in December 2019, the ITC case had been proceeding for nearly a year and was approaching the evidentiary hearing.

91.     Further, AEON has known of the ALJ's finding of misappropriation since July 2020, and the ITC's affirmance of that finding since December 2020.  In fact, as noted, AEON made a submission to the ITC in which it argued unsuccessfully that its Daewoong-made BTX products were not at issue in the ITC proceeding or, if they were, should be carved out from the ITC's remedial orders.  *Certain Botulinum Toxin Prods., Processes for Mfg. Or Relating to Same And Certain Prods. Containing Same*, Inv. No. 337-TA-1145, USITC Pub. 721669, AEON Biopharma, Inc.'s Public Interest Statement at 1 (Oct. 9, 2020).

92.     Thus, AEON has been fully aware of the allegations and findings the manufacturing process and *C. botulinum* strain used to make its BTX products, and which AEON itself has been actively exploiting, were misappropriated from Medytox.

93.     In the face of the ITC's findings that Daewoong's BTX products are made using the manufacturing process trade secrets and *C. botulinum* strain that were misappropriated from Medytox, Daewoong and AEON have continued this misappropriation in the United States through their collaboration to develop, conduct clinical trials of, seek FDA approval for, and ultimately market and sell therapeutic BTX

products in the United States.

## V.  COUNT I:  MISAPPROPRIATION OF MEDYTOX'S MANUFACTURING PROCESS TRADE SECRETS PURSUANT TO 18 U.S.C. § 1836

94.    Plaintiff incorporates the Paragraphs above as if fully set forth herein.

95.    Medytox is the owner of, and was, at all relevant times, in possession of the manufacturing process trade secrets.  Medytox's manufacturing processes are proprietary to Medytox and are not generally known to the public or others who can obtain economic value from their disclosure or use.  Medytox derives independent economic value from the fact that their trade secrets are not generally known to the public.  Medytox makes reasonable efforts to maintain the secrecy of its trade secrets.

96.    Daewoong and AEON are engaging in misappropriation and use of Medytox's trade secrets in the United States.  As set forth above, Daewoong and AEON's activities that are directed to and conducted in the United States include using Medytox's trade secrets by: (i) importing BTX products that were made with and that incorporate and embody Medytox's trade secrets; (ii) transferring to the United States and submitting to the FDA detailed information about the misappropriated manufacturing process and *C. botulinum* strain in order to seek FDA approval of their therapeutic BTX product, ABP-450; (iii) conducting and facilitating clinical trials for ABP-450; and (iv) working to commercialize and market ABP-450 in the U.S.

97.    Both Daewoong and AEON are engaging in this misappropriation of Medytox's manufacturing process trade secrets with knowledge that they were obtained by improper means.

98.    The misappropriation of Medytox's trade secrets has unjustly enriched Daewoong and AEON, and Medytox is entitled to recover the unfair advantage that using Medytox's misappropriated trade secrets has provided and is continuing to provide.  18 U.S.C. § 1836(b)(3)(B)(i)(II).  In the alternative, Medytox is entitled to a reasonable royalty for AEON's unauthorized use of Medytox's trade secrets.  18 U.S.C. § 1836(b)(3)(B)(ii).

99.   Because the acts of misappropriation by Daewoong and AEON are willful and malicious, Medytox is entitled to exemplary damages (18 U.S.C. § 1836(b)(3)(C)) and reasonable attorneys' fees (18 U.S.C. § 1836(b)(3)(D)).

## VI.   COUNT II:  MISAPPROPRIATION OF MEDYTOX'S TRADE SECRET *C. BOTULINUM* STRAIN PURSUANT TO 18 U.S.C. § 1836

100.   Plaintiff incorporates the Paragraphs above as if fully set forth herein.

101.   Medytox is the owner of, and was, at all relevant times, in possession of its *C. botulinum* strain.

102.   Daewoong and AEON have also misappropriated and used Medytox's *C. botulinum* strain and products made with the strain.

103.   A commercially viable *C. Botulinum* strain is a necessary element of any BTX product.  Daewoong improperly obtained Medytox's *C. botulinum* strain and is using it to produce all of its BTX products, including ABP-450.  Both Daewoong and AEON are now exploiting the fruits of this misappropriation in the United States, by importing into this country the ABP-450 products that are made with Medytox's *C. botulinum* strain, conducting clinical trials with the ABP-450 products, and providing information to the FDA about the strain and the products made with the strain in order to gain approval from the FDA for ABP-450.  If ABP-450 is approved by the FDA, AEON and Daewoong will continue to exploit the fruits of their misappropriation in the United States through the importation and sale of ABP-450 products here.

104.   While the ITC has determined that Medytox's *C. botulinum* strain does not qualify as a trade secret, that determination is currently under appeal before the Court of Appeals for the Federal Circuit.  As a result, Medytox asserts a conditional claim of trade secret misappropriation with respect to its *C. botulinum* on the basis of its good faith and nonfrivolous argument for modifying or reversing the conclusion that prior transfers of the Medytox strain rendered it ineligible for trade secret protection.

## VII.   PRAYER FOR RELIEF

105.   Medytox requests that the Court enter Judgment in its favor and grant the following relief.

106.   Permanent injunctive relief pursuant to which Defendants and their employees, or representatives, and all persons acting in concert or participating with it are commanded, enjoined, or restrained, directly or indirectly, by any means whatsoever, as follows:

   i. From using Medytox's trade secrets and other proprietary information to manufacture, offer to sell, or sell therapeutic BTX products incorporating, using, or made using Medytox's trade secrets, including without limitation ABP-450;

   ii. From disclosing Medytox's trade secrets and proprietary information; and

107.   A judgment requiring Defendants to disgorge all proceeds earned through the misappropriation and use of the Medytox trade secrets or otherwise compensate Medytox for the use of its trade secrets (18 U.S.C. § 1836(b)(3)(B)).  Specifically:

   i. Medytox seeks disgorgement of and/or compensation for the value of any proceeds and profits, benefits provided, and/or costs avoided that Daewoong or AEON have obtained or benefitted from as a result of their misappropriation and use of Medytox's trade secrets in connection with therapeutic BTX products in the United States, including without limitation ABP-450.  18 U.S.C. §1836(b)(3)(B)(i)(II).

   ii. In the alternative, Medytox is entitled to a reasonable royalty for Daewoong's and AEON's unauthorized use of Medytox's trade secrets in connection with therapeutic BTX products in the United States, including without limitation ABP-450.  18 U.S.C. § 1836(b)(3)(B)(ii).

108.   Exemplary damages and attorneys' fees, which are warranted on the basis of

Daewoong's and AEON's willful and malicious misappropriation of Medytox's trade secrets (18 U.S.C. § 1836(b)(3)(C) and (D).

109.   Prejudgment and post-judgment interest on the amounts set forth above.

Dated: May 14, 2021                          CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: */s/ David H. Herrington*
DAVID H. HERRINGTON (*pro hac vice pending*)
ARMINDA B. BEPKO (*pro hac vice pending*)
NOWELL BAMBERGER (*pro hac vice pending*)

Attorneys for Plaintiff
MEDYTOX INC.


Dated: May 14, 2021                          DURIE TANGRI LLP


By: */s/ Ragesh K. Tangri*
RAGESH K. TANGRI
W. HENRY HUTTINGER

Attorneys for Plaintiff
MEDYTOX INC.